**Exhibit C**



**Mark A. Sadler**

Complex Case Specialist
Travelers
Business Insurance Claim

(651) 310-7456
(866) 608-9633 (fax)

385 Washington Street
St. Paul, MN  55102

March 28, 2014

U.S. Mail and Email (abartell@mccarter.com)

Mr. Anthony Bartell
McCarter and English, LLP
100 Mulberry St.
Newark, NJ  07102

Re:     Insured:            Becton Dickinson & Company
        Claim No.:          EYL1550
        Lawsuit:            In re Hypodermic Products Antitrust Litigation
        Insurer:            Travelers Property Casualty Company of America and
                            Aetna Casualty and Surety Company
        Policy No(s):       Various

Dear Mr. Bartell:

This letter will respond to your letter of March 17, 2014 responding to Travelers coverage determination of March 10, 2014. As your letter takes issue only with the portion of our determination that addressed the policies issued to Benton Dickinson & Company by Aetna Casualty & Surety Company ("Aetna"), they will be the focus of our response.[1]

On behalf of Benton Dickinson & Company, you have requested coverage for this claim under twenty (20) different insurance policies issued by Aetna between October 1, 1978 and October 1, 1988. The policies are specifically identified in appendix I (Aetna "GL"

---

[1] Our declination of coverage as to the policies issued by Travelers Property Casualty Company of America (the Travelers policies) remains in full force and effect.  If you disagree with the position taken relative to the Travelers policies, please advise as to the specifics of your disagreement and we will respond accordingly.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 2

policies) and Appendix II (Aetna "AL" policies).[2]  Travelers declined coverage under, *inter alia*, the Aetna policies, and your March 17th letter raises several challenges to that declination.  Upon review, we agree that the Aetna policies provide "Personal Injury and Advertising Liability" coverage through the Broad Form Comprehensive General Liability Endorsement.  We also agree that the last day of the policy period of the last Aetna policy is October 1, 1988.

While we disagree with the balance of your March 17, 2014 letter, Travelers withdraws its declination of coverage under the Aetna policies, and will continue to investigate your client's claim under a full reservation of rights.  We set forth below a more detailed discussion of the reasons for our coverage reservations.

You will find a list of requested documents at the end of this letter. We ask that you provide the same at your earliest opportunity.

## SUMMARY OF THE CLAIMS

In the following paragraphs, I will provide a summary of the claims based on the information and documents provided to date. We realize that although this matter has been settled, Becton Dickinson & Company may continue to dispute the various allegations made by Plaintiffs.  By referring to those allegations in this letter, Travelers does not mean to imply that any of them are true.;

### *The Lawsuit(s)*

This matter was tendered to Travelers by McCarter and English as counsel for Becton Dickinson and Company ("BD") arising from class action lawsuits, including direct purchaser and indirect purchaser class action complaints pertaining to BD's marketing of hypodermic products. You have advised that BD settled all of the claims of the indirect purchaser class action on July 30, 2013 for $22 million and all claims for the direct purchaser class action on April 27, 2009 for $45 million. McCarter and English states that it has concluded that the class action lawsuits are potentially covered by Aetna  polices and, therefore, BD seeks coverage for defense and settlement expenses incurred.

### *Indirect Purchaser Class Actions*

The "indirect purchaser class actions" include three specific cases:

***In re Hypodermic Products Antitrust Litigation: Medstar Health, Inc., Medstar Georgetown Medical Center, Inc. and Washington Hospital Center Corporation and National Rehabilitation Hospital, Inc. v. Becton, Dickinson and Company*** ("BD") brought in the United States District Court for the District of New Jersey.

---

[2] Please note that we are unable to locate two policies referenced in your correspondence: **38 GL 16 SRA** and **38 AL 237649 SRA**. If you have copies of these policies, we ask that you please forward them at your earliest opportunity.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 3

In this first lawsuit, Plaintiffs (hospitals and healthcare providers that purchased disposable hypodermic products manufactured by BD) brought an action seeking equitable relief and damages for violation of the federal antitrust laws and various states antitrust laws. The disposable hypodermic products at issue include relevant product markets for: (i) disposable syringes and associated needles, (ii) disposable blood collection tubes, (iii) disposable blood collection tube holders, and (iv) intravenous catheter devices and their associated needles.  It was alleged that BD had been the dominant manufacturer of syringes and other disposable products in the United States and has been able to maintain its monopoly and/or market power in the markets for disposable hypodermic products by "unreasonably restraining trade and otherwise foreclosing competition through anticompetitive and illegal actions. As a result of this conduct, BD has been able to overcharge hospitals and other healthcare providers for its products. MedStar and the other healthcare providers complained that they "have been left to play the bills for BD's abuse of its dominant position."

Plaintiff further states that BD's anticompetitive practices were structured to eliminate competition for disposable hypodermic products. It is alleged that BD (i) imposed market share purchase requirements on healthcare providers, (ii) bundled its goods for exclusionary and predatory purposes, (iii) contracted with GPO's to impose exclusionary conditions on Class members, and (iv) bundled its goods with other manufacturers goods for exclusionary purposes. It is also alleged that absent BD's anticompetitive conduct, Plaintiffs and others would have paid less for the disposable hypodermic products purchased during the class period. The prices for these products would have been lower with unfettered competition because (a) BD would have been forced to compete with other products that were of a superior quantity and/or were less expensive, (b) healthcare providers would have replaced some disposable hypodermic products sold by Becton with less expensive products sold by competitors, and (c) BD's competitors would have been able to achieve economies of scale to put further downward pressure on BD's process.

Plaintiff alleges that since at least the late 1980's BD has used (and continues to use) anticompetitive and illegal practices to achieve and maintain its dominant market position and market power, unreasonably restrain trade and otherwise foreclose on competition in the relevant market by suppressing and foreclosing competition from existing competitors like Terumo Medical Corporation ("Terumo") and product innovators such as Retractable Technologies, Inc. ("RTI").

It is alleged that until July 2, 2004 when BD settled an antitrust lawsuit brought by RTI for $100 million, plaintiffs and other healthcare providers did not have sufficient reason to investigate BD's pricing and marketing practices. Accordingly, Plaintiffs alleged that BD's conduct had "tolled" the statute of limitations from at least 1988 through July 2, 2004 for the claims stated in this lawsuit.

Plaintiff asserted the following putative class periods:

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 4

"All hospitals and healthcare providers in the united States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period from 1988 through the present***"


Alternatively,


"All hospitals and healthcare providers in Alabama, Arizona, California, District of Columbia, Florida Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin***who purchased Disposable Hypodermic Products manufactured by Becton through a distributor or wholesaler at any time during the period 1988 through the present***"

Plaintiff asserted several causes of action, including: (i) violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act - Unreasonable Restraint of Trade, (ii) violation of Section 2 of the Sherman Act – Monopoly Maintinance, (iii) violation of Section 2 of the Sherman Act – Attempted Monopolization, (iv) state antitrust law violations, (v) violation of the District of Columbia's Antitrust law, D.C. Code Ann. §§ 28-4501, *et seq.*, and (vi) unjust enrichment.

Plaintiffs sought relief, including: (i) certification of a class, (ii) a determination that the complained of acts are unlawful, (iii) structural, prospective relief to promote competition, (iv) trebled damages determined to have been sustained by each Class member, (v) costs of the lawsuit, including reasonable attorney's fees, and (vi) an award of restitution.

***In re Hypodermic Products Antitrust Litigation: Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. v. Becton, Dickinson and Company*** ("BD") brought in the United States District Court for the District of New Jersey.

Plaintiffs in this lawsuit are pharmacies that purchased disposable hypodermic products manufactured by BD. The brought this action for nationwide relief and damages for violations of federal antitrust laws and various state antitrust laws.  The disposable hypodermic product markets include markets for: (i) disposable syringes and associated needles, (ii) disposable blood collection tubes, (iii) disposable blood collocation tube holders, and (iv) intravenous catheter devices and their associated needles.

Plaintiff asserted that it faced the daily problem to providing high quality health-care at an affordable price. BD, a large healthcare product manufacturer, for decades has been the dominant manufacturer of syringes and other disposable hypodermic products in the United States.  It was alleged that Becton had been able to maintain its monopoly and/or market power by unreasonably restraining trade and otherwise foreclosing competition through anticompetitive and illegal actions. As a result, Becton was able to overcharge pharmacies, and other persons, for its products. Plaintiffs and other persons dedicated to

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 5

providing medical care claimed to have been left to pay the bill for Becton's abuse of its dominant position.  The alleged anticompetitive practices include: (i) imposing market share purchase requirements on persons purchasing disposable hypodermic products, (ii) bundling of goods for exclusionary and predatory purposes, (iii) contracting with Group Purchasing Organizations ("GPO") to impose exclusionary conditions on Class members and (iv) bundling its goods with other manufacturer's goods for exclusionary purposes.

It was alleged that absent BD's anticompetitive conduct, Plaintiffs and other persons would have paid less for disposable hypodermic products purchased during the class period. Plaintiff claimed that prices for these products would have been lower with unfettered competition because (a) BD would have been forced to compete with other products that were of a superior quantity and/or were less expensive, (b) healthcare providers would have replaced some disposable hypodermic products sold by Becton with less expensive products sold by competitors, and (c) BD's competitors would have been able to achieve economies of scale to put further downward pressure on BD's prices.

Plaintiff further claimed that since at least the late 1980's BD had used anticompetitive and illegal practices to achieve and maintain its dominant market position and market power and to unreasonably restrain trade and otherwise foreclose competition in the relevant markets by suppressing and foreclosing competition from its competitors. Plaintiffs also asserted that BD's conduct had "tolled" the statute of limitations from at least 1988 through July 2, 2004 for the claims stated in this lawsuit.

Plaintiff asserted the following putative classes:

"All hospitals and healthcare providers in the United States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period from 1988 through the present***"

Alternatively,

"All hospitals and healthcare providers in Alabama, Arizona, California, District of Columbia, Florida Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin***who purchased Disposable Hypodermic Products manufactories by Becton through a distributor or wholesaler at any time during the period 1988 through the present***"

Plaintiff asserted several causes of action, including: (i) violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act - Unreasonable Restraint of Trade, (ii) violation of Section 2 of the Sherman Act – Monopoly Maintinance, (iii) violation of Section 2 of the Sherman Act – Attempted monopolization, (iv) state antitrust law violations, (v) unjust enrichment, and (vi) unjust enrichment (brought by the indirect

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 6

Class Members in Alabama, California, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, north Carolina, North Dakota, West Virginia and Wisconsin).

Plaintiffs sought relief, including: (i) certification of a class, (ii) a determination that the complained of acts were unlawful, (iii) structural, prospective relief to promote competition, (iv) trebled damages determined to have been sustained by each Class member, (v) costs of the lawsuit, including reasonable attorney's fees, and (vi) an award of restitution.

***The Hebrew Home for the Aged at Riverdale. v. Becton, Dickinson and Company*** ("BD") brought in the United States District Court for the Southern District of New York.

Plaintiff stated that it was one of many healthcare providers that purchased disposable hypodermic products manufactured by BD and, therefore, brought this class action for equitable relief and damages for violation of federal antitrust laws and various state antitrust laws.  The disposable hypodermic products at issue included relevant product markets for: (i) disposable syringes and associated needles, (ii) disposable blood collection tubes, (iii) disposable blood collection tube holders, and (iv) intravenous catheter devices and their associated needles.

Plaintiff claimed that BD's had been the dominant manufacturer of syringes and other disposable hypodermic products in the United States for decades and that it had been able to maintain its monopoly and/or market share by unreasonably restraining trade and otherwise foreclosing competition through anticompetitive and illegal actions. As a result, it was alleged that BD had been able to overcharge hospitals and other healthcare providers for its products. Hebrew Home complained that it and other Class members had been left to pay the bill for BD's abuse of its dominant market position.  Plaintiff specifically alleged anticompetitive practices including: (i) imposing market share purchase requirements on persons purchasing disposable hypodermic products, (ii) bundling of goods for exclusionary and predatory purposes, (iii) contracting with Group Purchasing Organizations to impose exclusionary conditions on Class members and (iv) bundling its goods with other manufacturer's goods for exclusionary purposes.

It is alleged that absent BD's anticompetitive conduct, Plaintiffs and other persons would have paid less for disposable hypodermic products purchased during the class period. Plaintiff claimed that prices for these products would have been lower with unfettered competition because (a) BD would have been forced to compete with other products that were of a superior quantity and/or were less expensive, (b) healthcare providers would have replaced some disposable hypodermic products sold by BD with less expensive products sold by competitors, and (c) BD's competitors would have been able to achieve economies of scale to put further downward pressure on BD's process.

Plaintiff claimed that since at least the late 1980's BD had used anticompetitive and illegal practices to achieve and maintain its dominant market position and market power, unreasonably restrain trade and otherwise foreclose competition in the relevant markets by suppressing and foreclosing competition from competitors. Plaintiff also claimed that

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 7

BD's conduct had "tolled" the statute of limitations from at least 1988 through July 2, 2004 for the claims stated in its lawsuit.

Plaintiff asserted the following putative class:

"All hospitals and healthcare providers in the United States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period from 1988 through the present***"

Alternatively,

"All hospitals and healthcare providers in Alabama, Arizona, California, District of Columbia, Florida Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin***who purchased Disposable Hypodermic Products manufactories by Becton through a distributor or wholesaler at any time during the period 1988 through the present***"

Plaintiff asserted several causes of action, including: (i) violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act - Unreasonable Restraint of Trade, (ii) violation of Section 2 of the Sherman Act – Monopoly Maintenance, (iii) violation of Section 2 of the Sherman Act – Attempted Monopolization, (iv) state antitrust law violations, and (v) unjust enrichment.

Plaintiffs sought relief, including: (i) certification of a class, (ii) a determination that the complained of acts were unlawful, (iii) structural, prospective relief to promote competition, (iv) trebled damages determined to have been sustained by each Class member, (v) costs of the lawsuit, including reasonable attorney's fees, and (vi) an award of restitution.

### *Direct Purchaser Class Action*

In its Second Consolidated Amended Class Action Complaint., titled *In Re Hypodermic Product Direct Purchaser Antitrust Litigation*, brought in the United States District Court for the District of New Jersey, plaintiff stated that it brought this action for equitable relief and damages because the prices that they and other members of the Class had paid for hypodermic products were artificially inflated due to BD's allegedly unlawful conduct.

Plaintiff claimed that BD illegally acquired and maintained monopoly power over various hypodermic products from at least January 2000 through the present.  The hypodermic products at issue included four relevant product markets: (i) disposable syringes and needles, (ii) blood collection devices, (iii) winged IV catheter devices and their needles,

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 8

and (iv) IV catheter devices and their needles. It was alleged that absent BD's anti-competitive conduct, Plaintiff and other class members would have paid less for the products in question during the specified class period. Specifically, without the exclusionary conduct, Plaintiff contends that BD's prices would have been lower and/or Class members would have replaced some of their purchases from BD with products sold by BD's competitors.

Plaintiff further alleged anti-competitive conduct including: (i) imposition of market share requirements on hospitals and health care entities, (ii) bundling of goods for exclusionary purposes, (iii) conspiring with Group Purchasing Organizations ("GPO") to impose exclusionary contracts, and (iv) conspiring with other established manufacturers to impose rebate penalties on purchasers relating to bundling of products.

Plaintiff claimed that imposition of the market share requirements effectively made Becton's rebates and discounts continent on hospitals purchasing all of a particular product line from BD. Plaintiff also claimed that BD bundled or tied its rebates for various unrelated products by requiring hospitals to fill a high percentage of one line of products as a condition to receive rebates on that and other of BD's products, and that BD conspired with GPO's to implement and enforce its exclusionary contracts and policies on large groups of hospitals and similar entities. Further, Plaintiff claimed that BD conspired with other established medical device manufacturers to force hospitals and health care entities to fill a dominate part of their Hypodermic Products needs with BD products.

Plaintiff claimed that the cumulative effect of these practices had been to foreclose competing manufacturers of the relevant Hypodermic Products from a substantial portion of the respective markets and to prevent them from gaining market share, achieving economies of scale and scope and driving down prices.

Plaintiffs brought this action on behalf of classes of persons, including:

"All persons and entities who purchased Relevant hypodermic Products in the united states directly from Becton at any time during the period from March 23, 2001 through the present" and "[a]ll persons and entities who purchased disposable syringes and associated needles, of the, in the United States directly from Becton at any time during the period March 23, 2001 through the present."

Plaintiff asserted three causes of action, including: (i) Monopolization – Sherman Act § 2,[3] (ii) Violation of the Sherman Act § 2 – Conspiracy to Monopolize,[4] (iii) Violation of the Sherman Act § 1 – Anti-Competitive Conspiracy.

---

[3] It was alleged that BD acted "willfully" to maintain and exercise monopoly power in the relevant market through exclusionary, anti-competitive conduct included leveraging its dominant market share in one or more markets to maintain, enhance and obtain monopoly power in other markets.
[4] Plaintiff alleged that BD agreed, conspired and colluded with GPO's such as Novation, Premiere, Med Assets and other medical-device manufacturers to assist BD in excluding competition and willfully maintaining and unlawfully exercising monopoly owner.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 9

Plaintiff sought relief, including: (i) certification of a class, (ii) a declaration that the acts complained of were in violation of Sherman Act §§ 1 and 2, (ii) trebled damages, (iv) attorney fees and costs of the lawsuit, and (v) structural prospective relief to promote competition.

## AETNA POLICY PROVISIONS

Aetna provided two sets of policies during the period October 1, 1978 - October 1, 1988. The first set of coverages provides Comprehensive General Liability ("CGL") coverage, the policies providing this coverage incorporate a "GL" in the policy number and as advised above are listed in appendix I to this letter. The second set of coverages include both CGL coverage and commercial auto coverage and are provided in a policy that incorporates an "AL" in the policy number, and as advised above are listed in appendix II to this letter.  The "AL" and "GL" policies incorporate the same general policy language as pertains to the CGL coverage. The pertinent policy language is as follows:[5]

The Comprehensive General Liability coverage form contains the following insuring agreement which reads in relevant part as follows (CC-5296 (Ed. 08-74)):

I          **BODILY INJURY LIABILITY COVERAGE**
           **PROEPRTY DAMAGE LIABILITY COVERAGE**

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

          **Bodily Injury or**
          **Property Damage**

To which this insurance applies caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment of to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

* * *

The policies contain form GL0404 (Ed. 05-81), Broad Form Comprehensive Liability Endorsement ("Broad Form Endorsement"). The Broad Form Endorsement adds Personal Injury and Advertising Injury Coverage as follows:

---

[5] Please note that Travelers is currently in the process of determining the impairment (if any) of the aggregate limits for the above referenced policies. In the event the aggregate has been impaired for any of these polices, we will so advise once our review of the same has been completed.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 10

II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

(A)   The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of **personal injury** or **advertising injury** to which this insurance applies sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

(B)   This insurance does not apply:

* * *

(7) with respect to **advertising injury**:

* * *

(b) to any injury arising out of any act committed by the insured with actual malice.

* * *

(C)   Limits of Liability:

Regardless of the number of (1) insured's hereunder, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of **personal injury** or **advertising injury**, the total limit of the company's liability under this coverage for damages shall not exceed the limit of liability stated in the endorsement as "aggregate."[6]

(D)   Additional Definitions:

"Advertising injury" means injury arising out of an offense committed during the policy period occurring in the course of the insured's advertising activities if such

---

[6] In the "schedule," the Broad Form Endorsement states that the Personal and Advertising Injury limits shall be the per occurrence bodily injury limit unless otherwise indicated. The Aetna policies did not list another limit in the section indicated, so the "aggregate" for this coverage is per Occurrence limits listed on the attached appendices.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 11

injury arises out of libel, slander, defamation, violation of right of privacy, unfair completion, or infringement of copyright, title or slogan.

"**Personal Injury**" means injury arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, imprisonment or malicious prosecution.
(2) wrongful entry or eviction or other invasion of the right of private occupancy.
(3) a publication or utterance
    (a) of a libel or slander or other defamatory or disparaging material, or
    (b) in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured are not deemed personal injury.

The General Provisions for Liability Policies form CG5022 (Ed. 01-73) contains the following pertinent definitions:

\* \* \*

"Bodily Injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

\* \* \*

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected not intended from the standpoint of the insured;

\* \* \*

"Property Damage" means (1) physical injury or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

\* \* \*

The General Provisions form also includes several conditions defining an Insured's Duties in the Event of Occurrence, Claim or Suit:

4.     **Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an **occurrence**, injury or damage written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and available witnesses shall be given by or

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 12

      for the **insured** to the **company** or any of it authorized agents as soon as practicable.[7]

(b) If claim is made or suit if brought against the **insured**, the insured shall immediately forward to the **company** every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the **company** and, upon the **company's** request, assist in making settlement, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy, and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

\* \* \*

The Aetna policies also include Special Endorsements titled "**Limitation of Coverage**" which limit the coverage available as follows:

\* \* \*

     "It is also agreed that, for the sole purpose of arming at the aggregate limit of liability of a particular coverage, this policy and those scheduled will be deemed to be one policy with a single aggregate limit of liability for such coverage.

     It is further agreed that the policy does not apply to hazards to which such scheduled policies are inapplicable solely because of the exhaustion of the limit of liability provided therein."[8]

---

[7] Please note that the "GL" policies in effect from 10/1/1986 – 10/1/1988 contain form T-207 which added the following additional language: "provided that with respect to the named insured such notice shall be given as soon as practicable after knowledge of the occurrence, injury or damage has been reported to an executive officer of the named insured or to the employee designated by the named insured to give such notice" to section 4 (a) cited above.

[8] Please note that in each case, the "schedule of policies" on the Limitations of Coverage endorsement includes the corresponding AL or GL policy during the policy term in in effect. Therefore, for the policy terms in question, although there are two policies, they are deemed by virtue of the endorsement to be "one policy with a single aggregate limit of liability." Please let us know if you would like copies of the individual endorsements for each Aetna policy term.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 13

Finally, all of the "AL" and the "GL" policies with the exception of those in place between 10/1/1986 and 10/1/1988 contain a Special Endorsement titled "**Notice of Occurrence**" which adds the following policy condition:

> "It is agreed that written notice of each occurrence of accident shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable after notice thereof has been receive by the Director of Corporate Risk, Becton Dickinson & Company, Paramus, New Jersey."

## RESERVATION OF RIGHTS

- Plaintiffs are not seeking to recover damages for "Bodily Injury" or "Property Damage" caused by an "Occurrence" as those terms are defined in the Aetna policies.  No bodily injury or damage to or loss of use of tangible property is at issue.   Even if such damages were sought, no coverage is available under the Aetna policies for any "Bodily Injury" or "Property Damage" that did not  occur during the policy period(s). BD has taken the position that the Aetna  policies dating back to October 1, 1978 have been implicated by virtue of actual allegations alleging conduct "beginning in the 1970's" and the class period of the Indirect Purchaser Class which Becton Dickinson advised "includes the years 1988 through the present." The termination date of the last Aetna policy is October 1, 1988.  Travelers also reserves the right to deny coverage for any "Bodily Injury" or "Property Damage" not caused by an "Occurrence," defined by the Aetna policies as an "accident," or for any "Bodily Injury" or "Property Damage" expected or intended by BD.

- In order for coverage to exist for "Personal Injury," the damages sought  must arise out of one or more of the following offenses committed during the policy period: false arrest, detention, imprisonment, malicious prosecution, wrongful entry or eviction (or other invasion of the right of private occupancy), publication or utterance of a libel or slander or other defamatory or disparaging material, or violation of an individual's right of privacy. As the claims made by Plaintiffs in the direct and indirect purchaser class action lawsuits did not include these offenses the personal injury coverage is inapplicable. In addition, if the damages for "Personal Injury" were sought (which Travelers denies), Travelers reserves the right to deny coverage for any "Personal Injury" arising from  an offense that was not committed during the policy period(s).

- You have asserted that the  "Advertising Injury" coverage of the Aetna policies applies to the claims asserted against BD.   In order for "Advertising Injury" coverage to apply, the injury must arise out of an offense committed during the policy period(s) and in the course of BD's advertising activities. Further, the Advertising Injury must arises out of libel, slander, defamation, violation of right of privacy, unfair competition, or infringement of copyright, title or slogan.  BD has taken the position that the claims of plaintiffs in the direct and indirect purchaser  class  actions  constitute  "unfair  competition"  and,  therefore,

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 14

"Advertising Injury." Travelers reserves its right to deny coverage to the extent plaintiff's claims do not satisfy the "unfair competition" offense. Travelers further reserves the right to deny coverage to the extent any offense was not committed the course of BD's advertising activities and/or during the policy period(s). Travelers also reserves the right to deny coverage for any injury arising out of any act committed by BD with actual malice.

- The lawsuits in this case were filed in 2006 and matter was defended by BD and ultimately settled, all without notice of the matter to Travelers. The first report of this matter to Travelers came on December 27, 2013, after BD agreed to make voluntary payments and settle the cases, without Travelers' knowledge or consent. The Aetna policies required BD to make a report to Travelers or one of our authorized representatives as soon as possible after having knowledge of the accident, act, error, event, incident, offense, or omission. It was also agreed on several of the Aetna policies that written notice of each occurrence of accident would be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable after notice thereof has been receive by the Director of Corporate Risk for BD, Paramus, New Jersey. Additionally, the Aetna policies required BD to "immediately forward" all suit papers and written demands to Travelers. The policy also requires that BD not, except at its own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without Travelers' consent.

    BD, which was apparently well aware of the Aetna policies, did not comply with any of the foregoing conditions. Your March 17, 2014 letter does not dispute this, but asserts that Travelers cannot possibly deny coverage in connection with your clients' breach of the notice and, presumably, cooperation and voluntary payment provisions of the Aetna policies.. We disagree, and continue to reserve the right to deny coverage based on BD's failure to provide timely notice, failure to cooperate, unilateral decision to settle and its voluntary payments in connection therewith.

**DEFENSE COSTS ISSUES**

Travelers will share in the reasonable and necessary defense costs incurred by BD after December 27, 2013. Travelers will not pay any defense expense incurred by or on behalf of BD prior to its tender of the same to Travelers on December 27, 2013.

Defense costs include only fees incurred for the defense of BD in connection with the class action lawsuits tendered and do not include fees related to coverage matters, corporate matters, or the prosecution of any affirmative claims that involve facts beyond the scope of those at issue in the suit.

Disbursements will be paid at the actual out-of-pocket cost, with no law firm surcharge. Additional information regarding disbursements is contained in the Travelers Billing

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 15

Requirements, which are attached to this letter. We ask that you please forward the following regarding the ongoing defense of this matter:

- Identify of the law firm and lawyer currently handling his matter for Becton Dickinson.
- Copies of invoices and supporting expense document for expenses incurred post-December 27, 2013.


**REQUEST FOR INFORMATION**

To date, the factual information that you and your client have provided to Travelers in connection with the matter is limited to three letters from McCarter & English, copies of the lawsuits, a copy of a release and the PACER summary page for the lawsuits and settlement. In order that we may continue our investigation of this matter, and the points you have raised, we ask that you please provide the following information (as well as any other material or information you believe to be pertinent) at your earliest opportunity:

(i)     Please provide copies of all evaluations and status reports prepared by defense counsel for BD during the litigation and resolution of this matter. We also ask that we be provided copies on this material on a go forward basis.

(ii)    Please provide copies of key documents, depositions and written discovery requests obtained in the litigation of this matter.

(iii)   Please provide complete copies of the settlement agreement, all exhibits and all orders or other documents form the court in connection with the settlement of this matter.

(iv)    Please provide or direct the claim administrator to provide copies of the claim notices and instructions for each class action, copies of all claim forms received and copies of any and all summary reports pertaining to the response of the class.

(v)     Please advise us whether BD contends that it was unaware of the Aetna policies at the time the lawsuits were filed and/or the events giving rise thereto and, if so, please advise when BD learned of the Aetna policies.

(vi)    Please provide an explanation as to why Travelers was not notified of the claims, lawsuits and settlement until December 27, 2013.


**<u>CONCLUSION</u>**

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 16


This coverage determination is based on information that has been made available to date. Travelers expressly reserves its right to modify or supplement this coverage communication based on additional information obtained or received.  If you have any other information that you believe may affect our coverage determination, please feel forward such information to me immediately.

Please note that nothing contained in this letter shall be construed as a waiver of the terms or conditions of any policy of insurance issued to BD.. Travelers specifically reserves all rights including but not limited to  the right to rely on any policy term, condition, provision or exclusion or any other ground that may be subsequently found to limit or preclude coverage. Please note that other policy terms, conditions, limitations, and/or exclusions may apply to this claim, even if not specifically addressed in this letter.

Pursuant to New Jersey law, an internal appeals process is available if you wish to appeal the disposition of this claim.  To file an appeal, please send written notice to:

Travelers
New Jersey Claim Center
P.O. Box 1900
Morristown, NJ 07962
Attention: Claim Appeals Panel
Fax (888)256-3308

In addition, the State of New Jersey maintains an Office of Insurance Claims Ombudsman, whose contact information is as follows:

Office of Insurance Claims Ombudsman
Department of Banking and Insurance
PO Box 472
Trenton, NJ 08625-0472
Telephone: (800) 446-7467
Telefax: (609) 292-2431
E-mail: ombudsman@dobi.state.nj.us

The foregoing notice was inadvertently omitted from our March 10, 2014 correspondence, and is equally applicable to Travelers' coverage position with respect to the policies issued to BD by Travelers Property Casualty Company of America.

Mr. Anthony Bartell
McCarter and English, LLP
03/28/2014
Page 17

If you have any questions, please feel free to contact me at (651) 310-7456 direct-dial / (866) 608-9633 fax.

Sincerely,

AETNA CASUALTY AND SURETY COMPANY
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA


By _____
Mark A. Sadler
Complex Case Specialist, Business Torts Claim
 (651) 310-7456
(866) 608-9633
msadler@travelers.com

 Cc:

U.S. Mail and Email (sarah.walsh@marsh.com)

Ms. Sarah Walsh
Marsh & McLennan Companies
1166 Avenue of the Americas
New York, NY 10036